McDUFFEE MOTOR FREIGHT, INC.
and United Trucking
Service, Movants,

v.

BRONAUGH MOTOR EXPRESS,
INC., Respondent.

Supreme Court of Kentucky.

July 6, 1982.

Rehearing Denied Aug. 31, 1982.

Ben L. Kessinger, Jr., Ted J. Campbell, Harbison, Kessinger, Lisle & Bush, Lexington, for movants.

Donald H. Balleisen, Philip D. Scott, Greenebaum, Doll & McDonald, Lexington, for respondent.

STEPHENSON, Justice.

The trial court entered judgment against United Trucking Service, Inc., and McDuffee Motor Freight, Inc., for breach of contract, ordered specific performance, and assessed damages. The Court of Appeals affirmed. We granted discretionary review and reverse.

This is primarily a fact case and the principal arguments concern the conclusions of law applied to the facts.

This dispute arose from a proceeding before the Interstate Commerce Commission, and if there is a villain in this scenario it is the ICC and the curious procedure employed by it.

In 1969 Ellis Trucking Co., owner of McDuffee, sought to sell off the interior or peddle routes operated by McDuffee. This involved the sale of segments of McDuffee's routes to four trucking concerns. We are concerned here with the contract entered into between McDuffee and Bronaugh. After several months of negotiation, Bronaugh and McDuffee entered into a contract by the terms of which McDuffee agreed to sell to Bronaugh a portion of its

route structure consisting of interior or *peddle* routes in central and southeastern Kentucky, retaining for itself the longer or *overhead* routes. It is apparent from the record that in 1969 these *peddle* routes were unprofitable for McDuffee. The trucking industry being regulated, ICC approval of the terms of the contract of sale was necessary.

One of the clauses of the contract provided:

"The vendor agrees to fully cooperate with the vendee in preparing and prosecuting the necessary application before the Interstate Commerce Commission and to furnish all required data and competent witnesses."

The contract also provided as follows: "In the event that the Interstate Commerce Commission were to make *minor modifications* in the authority to be acquired by vendee or in the retained authority of vendor or in the authority being sought by vendor in the public convenience and necessity application, then the parties shall have the right to meet and discuss such *minor modifications* and decide mutually whether to consummate the transaction. However, in that event there will have to be an agreement by both parties in order to consummate the sale." (Emphasis added.)

In May 1970, United Trucking Service, Inc. purchased McDuffee. The other three sales of McDuffee routes were approved by the ICC and the transactions consummated. However, the ICC approval of the sale of McDuffee to Bronaugh was unaccountably delayed.

In January 1972, the hearing officer filed a report and recommended an order which was subsequently amended February 23, 1972. This culminated in an order of the ICC served October 13, 1972. This order refers to the report of the hearing officer and authorized Bronaugh to purchase a portion of the operating rights of McDuffee. The order rejected the exceptions filed by three trucking firms opposing the sale. The order further modified the recommendation of the hearing officer as to service of

off route points within specified mileage radius of the described regular routes. The contract between Bronaugh and McDuffee provided for routes between specified points in six instances, off route service within three miles of the specified route, and in one instance service within five miles of the specified route. The ICC order modified the recommendation that would authorize service of these route points in accordance with the terms of the contract and *modified the recommendation* (and the contract) to limit off route service of these routes to one mile.

Next the attorney for McDuffee wrote a letter to the secretary of the ICC stating that the modifications as proposed in the order were acceptable to Bronaugh and McDuffee. The letter suggested the writer's interpretation of the order and sought a clarification of the statement regarding the January 1972 recommended order and asked for an extension of time to be advised. Bronaugh informed McDuffee it was ready to consummate the contract of sale and this was set for November 2, 1972.

It is now that the plot thickens and the difficulties begin. In this chronology before the ICC, on November 1, 1972, the three trucking companies filed a petition for reconsideration asking for a stay; the ICC granted an order November 2, 1972, staying the effective date of the October order; November 9, 1972, Bronaugh filed reply to the petition for reconsideration; December 8, 1972, Eubanks Electric Supply Company of Corbin filed a petition to intervene; December 15, 1972, three other Corbin business concerns sought to intervene and reopen the proceedings; December 26, 1972, McDuffee filed a motion to strike the petitions to intervene; March 6, 1973, another Corbin business concern filed a petition to intervene and reopen; May 2, 1973, Bronaugh filed a reply to this motion.

All these proceedings culminated in the ICC issuing an order dated July 3, 1973. In this order the petitions for reconsideration filed by the trucking companies were rejected together with McDuffee's motion.

The petitions of Eubanks and the other Corbin businesses to intervene and reopen for prosecution of evidence of harm to the shippers of Corbin were rejected. However the ICC order then recited that the proceeding was reopened *on its own motion.* The order further stated that the application would terminate an existing through service between Knoxville, Tennessee, and Corbin, Kentucky. Then after finding that a grant of *overhead* authority between Corbin and Knoxville would be a continuation of present service, the order provided that *McDuffee* would provide this service between Knoxville and Corbin and that this authority *"be, and it is hereby, specifically made a condition to our overall approval of the involved section 5 application."* (The sale as approved by the October 1972 order.) The order then recited that shippers would use this service rather than the new McDuffee-Bronaugh interline service (as provided for in the contract) and that the parties may agree on a purchase price less than proposed.

July 17, 1973, in a meeting United-McDuffee officers informed Bronaugh that the ICC order relative to the Knoxville-Corbin route was a modification of the contract and gave United-McDuffee the right to void the entire contract inasmuch as United-McDuffee would not continue this service. United-McDuffee was informed that Bronaugh intended to consummate the contract.

Bronaugh then set about to remedy what is conceded by counsel to be a modification of the contract. Bronaugh proceeded to file an extraordinary or *ex parte* petition with the ICC to reopen the matter.

July 27, 1973, the ICC delivered itself of another order. In substance the order of July 3, 1973, was set aside, the need for the Corbin-Knoxville service was recited and that Bronaugh had applied for a separation of the issues and indicated that it desired to perform the Knoxville-Corbin service and thus achieve a consummation of the McDuffee contract. Then the order recited the public interest would be best served by returning the parties with a *related procedural modification* to the status quo represented by the October 12, 1972, order. The order then provided that " . . . the matter involving the Knoxville, Tenn.-Corbin, Ky. route, be, and it is hereby, so separated; *provided, however, that as a condition precedent to the separation of the Knoxville-Corbin matter from the section 5 proceeding in No. MC–F–10780, Bronaugh Motor Express, Inc. shall file whatever application it deems appropriate to provide this service as represented herein."* (Emphasis ours.)

Bronaugh applied to the ICC August 6, 1973, for the Knoxville-Corbin service and this service was granted to Bronaugh by the ICC on September 25, 1973.

McDuffee in the meantime filed a petition to set aside the July 27, 1973, order and Bronaugh again notified McDuffee that it was ready to consummate the transaction.

November 8, 1973, the ICC issued an order denying the petition of McDuffee and recited that the proceedings had been separated, that Bronaugh had filed application for the Knoxville-Corbin route and that such application established good faith compliance with terms and conditions set forth in the July 27, 1973, order and made the order final.

United-McDuffee maintained that the November 8 order was at variance with the terms of the contract, thus allowing them to void the contract.

By order dated November 11, 1974, the ICC held that the July 27, 1973, order was a final order and not conditional in any way and granted approval of the sale between Bronaugh and McDuffee. There was no resolution of any issues regarding service between Knoxville and Corbin.

Also in November 1974, Bronaugh filed a motion for clarification directed to the ICC reciting that McDuffee had refused to consummate the transaction and that Bronaugh had filed suit. There is a recitation that during the course of depositions of officials of McDuffee and United, they had contended the November 8, 1973, order required Knoxville-Corbin service as a prerequisite to approval of the sale.

December 26, 1974, the ICC issued an order reciting the separation of the Knoxville-Corbin issue from the other proceeding and stated that the November 8, 1973, order was not conditional in any manner.

May 14, 1975, the ICC entered a final order denying all motions and petitions for reconsideration. This rings down the curtain on the proceedings before the ICC.

The trial court held that McDuffee had breached the contract, that the ICC separation of the Knoxville-Corbin route satisfied the clause against modification and that the parties could not bind the ICC as to agreeing to cease service on that route. Therefore the trial court held that McDuffee had no excuse to refuse to consummate the contract after the November 8 order of the ICC was filed.

The trial court further concluded, based upon the cooperation clause of the contract *supra*, that McDuffee did not cooperate in the prosecuting of the necessary application before the ICC, but rather in conjunction with United actively sought to have the application of Bronaugh denied or at least modified so that McDuffee and United could avoid closing the sale.

This conclusion is based on the trial court's findings that 1) on November 4, 1972, Ben Donaldson, manager of the Lexington terminal for United-McDuffee, asked a Jamison Jones if he could recommend an attorney in the Corbin-Williamsburg area, Jones recommended Eugene Siler, Donaldson asked Jones to contact Siler to see if Siler would represent United-McDuffee in a hearing before the ICC; 2) Siler contacted the Ames firm in Washington to act as co-counsel in representing United in the proceeding which was pending before the ICC regarding the proposed sale of authority from United-McDuffee to Bronaugh; 3) Siler was paid an attorney's fee by United-McDuffee to represent Eubanks and the other protesting companies so as to cause the ICC to disapprove the application seeking approval of the sale to Bronaugh; 4) Eubanks, acting as agent for United-McDuffee and pursuant to the request of some representative or officer of

United-McDuffee, requested the other companies to file objections to the sale; 5) Eubanks' testimony that he obtained the information which he needed to file the intervening petition from Doug Brown, United terminal manager in Corbin. (This finding or conclusion is explained by Brown and Eubanks that the information Eubanks requested came from the routing guide manual which is standard equipment for all terminals.)

The Court of Appeals' opinion states that the trial court's findings of fact are complete on all issues and are supported by substantial evidence.

We have examined the entire record on the liability phase of the trial, including depositions, transcript of evidence, and exhibits. The record is replete with insinuation that United-McDuffee were responsible for blocking the consummation of the sale and with accusations of underhanded dealings in procuring opposition to the sale. The difficulty is that there is absolutely no evidence to substantiate the findings of fact, 1) through 4) *supra*.

These findings were precipitated by United-McDuffee paying a fee to Siler. According to Donaldson and Donald Martindale, a vice-president of United-McDuffee, after the stay of the October order granted by the ICC at the request of the three protesting truck companies, United-McDuffee had a problem caused by closing their Danville terminal and transferring some employees to Lexington where they were surplus, but according to the terms of the union contract had to be paid. They were concerned as to the length of the delay before the ICC acted. They contacted Jamison Jones to recommend someone who might be able to find out how long a delay or perhaps expedite the matter. Jones contacted Siler who agreed to accept employment. Martindale gave Jones an envelope containing $3500 in cash which was given to Siler. Siler employed the Ames law firm in Washington, D. C., and dealt with a Mr. Kragen.

Dallas Eubanks, owner of Eubanks Electrical Supply of Corbin, the same concern mentioned in the July 1973 ICC order, testi-

fied in the case. He testified that he did not receive the *Federal Register* that listed the route changes in the McDuffee-Bronaugh sale and was concerned about the elimination of the Knoxville-Corbin route. He contacted a commissioner of the ICC, a friend of his and formerly a resident in a neighboring town. He had consulted with the commissioner on many occasions in the past as he owned a trucking terminal in Corbin. He asked advice on how to proceed to protect his interests and was advised to file a petition and procure other concerns to file petitions in protest. Eubanks then hired Siler, a relative. Siler informed Eubanks he had engaged the Ames firm in Washington. Eubanks consulted with Kragen of that firm November 17, 1972, who filed his petition as well as those of the other concerns who were protesting. Eubanks informed the other firms that he would take care of the legal fees. He testified that he paid Siler a fee of $2500.

Siler was deposed by Bronaugh and answered interrogatories propounded by Bronaugh.

Siler testified in the deposition that he knew nothing about this case and had never met or talked to any official of any corporation or firm that was a party to the suit, that he was employed in another entirely different matter now pending before the ICC and that employment is a confidential matter between attorney and client.

Later Siler answered interrogatories that in 1972 he was employed by United, through Jamison Jones, on or about November 10, 1972, for a fee of $3000 plus expenses. The fee was paid November 12, 1972, by cash delivered by Jamison Jones. He associated the Ames law firm of Washington, D. C., whose specialty was ICC matters, and paid Ames a $1350 fee. In answer to what services were rendered by that firm, he answered he did not have sufficient information or knowledge to answer the question. He stated that he and the Ames firm filed the Eubanks petition for leave to intervene, but that in that matter they were not representing United or McDuffee. He also stated that he filed petitions for the other Corbin business concerns.

Kragen, the member of the Ames firm who prepared and filed the petitions for Eubanks and the other Corbin businesses, answered interrogatories as to filing the petitions at the request of Siler. This request was on November 16, 1972, and a discussion and request by Eubanks on November 17, 1972. Kragen stated that he did not confer with any officer, agent, employee or attorney of or for United or McDuffee in connection with the preparation and filing of the petitions for Eubanks et al.

He further stated that when the case was first given to him to handle he was told by another member of the firm that he was to file the petition in behalf of United. He called Donald Martindale of United on November 16, 1972, and was informed by Martindale that the petition was not to be filed in behalf of United, citing the contract of sale and stating this would risk a breach of contract suit. Kragen further said Martindale told him he was not authorized to say any more or help in any way in the preparation of the petition. Kragen then again stated that the petitions were not filed in behalf of United or McDuffee and that the Ames firm did not perform any services for these companies.

There are a number of suspicious circumstances revealed in the evidence, for example, Jones received copies of letters from Siler and from Kragen as to the progress of the Eubanks petition. The really suspicious and unexplained circumstance is the service, if any, performed for United-McDuffee by the Ames firm. Why this matter was not explored by Bronaugh in the interrogatories to Siler and Kragen is incomprehensible. Accusations of "dirty tricks" on the part of United-McDuffee appeared throughout Bronaugh's claim, and the findings of the trial court and the conclusions of law on this issue seemed to play an equal part in the judgment of the trial court finding for Bronaugh. In summary, all United-McDuffee's officials and employees denied any connection with the Eubanks petitions. Eubanks denied any contact with United-McDuffee in this matter. Siler and Kragen

both denied any representation of United-McDuffee in the Eubanks proceeding. None of this testimony is contradicted by Bronaugh. Kragen and Siler could have clarified the representation issue, but for some reason Bronaugh did not explore this avenue and we are not inclined to speculate on the issue.

There is an additional factor in this case on this issue and that is twice United-McDuffee agreed to *minor modifications* in the contract.

■ We interpret the *minor modification* paragraph in the contract to mean the contract would necessarily require approval exactly as written or either party could decline to agree to any modification and void the contract.

The first modification is described by Bronaugh and Pierce, his attorney in the ICC proceeding. Pierce testified that one of the routes, Harlan-Middlesboro, involved in the contract of sale, duplicated a route retained by McDuffee. He testified they did not put the duplication in the contract because they did not want it called to ICC's attention and hoped it would be passed over. However at the hearing, the three trucking companies who protested raised the issue, and Pierce advised Bronaugh to delete this route or the ICC might void the entire contract. Bronaugh complained that this could have been accomplished by a single amendment to the contract, but United-McDuffee required Bronaugh to make an amendment deleting all authority south of the Knox County line. The point here is that United-McDuffee did agree when they were not required to do so with a good chance that the ICC would just void the entire contract as expressed by Pierce. Incidentally Pierce testified that the application as submitted results in cessation of Knoxville-Corbin direct service, and that when the contract was written all parties knew the Corbin-Knoxville route would be eliminated.

Next the ICC in the October order cut down the mileage of off route service from the three- and five-mile agreements in the contract to one mile in all instances. Unit-ed-McDuffee and Bronaugh agreed to this modification. Both these modifications affected Bronaugh instead of McDuffee. Nevertheless they were *minor modification* of the contract, and if United-McDuffee had the sinister purpose attributed to them in attempting to subvert the contract, they passed up two wonderful opportunities.

■ We are of the further opinion the cooperation clause in the contract extended only to the original application and did not extend to any duty to resist the subsequent protests, and the reliance of the trial court on this clause is misplaced. McDuffee did file a motion to strike the Eubanks petition.

■ The direct evidence is that United-McDuffee did not take advantage of the two opportunities to void the contract. From there on, there is no direct evidence or inference from the testimony that United or McDuffee sought to have the ICC deny or modify the terms of the contract. To the extent the trial court relied on these findings of fact to impose liability on United-McDuffee, the trial court is in error.

Turning again to the proceedings before the ICC, the July 3, 1973, order directing the continuance of the Knoxville-Corbin route is clearly at least a *minor modification*, and this is recognized by both parties. The trial court took the position later ICC orders cured the defect.

■ The ICC orders are masterpieces of double talk. The July 3 order rejects the petitions of Eubanks and others to reopen then proceeds to reopen and order the relief sought, continuation of the Knoxville-Corbin route. The *ex parte* order of July 27 then set aside the July 3 order, reinstating the October 1972 order and does what it calls a separation of the issues approved the sale, but only on condition that Bronaugh apply for the Knoxville-Corbin route. By subsequent order Bronaugh is granted that route and the ICC then states there was no condition to its order of approval of the sale, denying the obvious. Finally on November 8, 1973, the ICC again approves and apparently gives an opinion for the edifica-

tion of the trial court that there never was a condition of the sale. The trial court is correct in saying the parties had no power to bind the ICC to their contract. The other side of the coin is that by sleight of hand the ICC could not say that it did not modify the contract. The modification in the July 3 order is now irrevocable. Bronaugh has the route. All parties agree the contract contemplated elimination the Knoxville-Corbin route; all agree the July 3 order contained a *minor modification* in directing the continuance of the Knoxville-Corbin route. The ICC continuously made continuance of the route a condition precedent to approval of the contract of sale and statements to the contrary cannot erase this fact. The order of approval of November 1973 approved a contract with the Knoxville-Corbin route not eliminated. This gave United-McDuffee the right to refuse to agree to the modification and void the contract.

It is elementary here that if the proof showed United-McDuffee had deliberately contributed to or set in motion an effort by third parties to create a modification whereby United-McDuffee could decline to consummate the contract, then United-McDuffee could not rely on such modification to evade consummation of the contract. There is a complete failure of proof to impose liability on this issue.

In view of our disposition of these issues, we do not reach the question of damages.

The decision of the Court of Appeals and the judgment of the trial court are reversed with directions to enter a judgment dismissing the complaint of Bronaugh.

PALMORE, C. J., and CLAYTON, O'HARA, STEPHENS, STEPHENSON, and STERNBERG, JJ., concur.